Argued December 15, 1932, reversed January 10; rehearing denied
February 14, 1933

## ERICKSON *v.* MEIER & FRANK CO.

(18 P. (2d) 207)

*Leroy Lomax,* of Portland (Lomax & Lomax, of
Portland, on the brief), for appellant.

*L. A. Recken,* of Portland (Senn & Recken, of Portland, on the brief), for respondent.

KELLY, J. Defendant is a corporation engaged in the operation of a department store in Portland. On the morning of December 18, 1929, plaintiff was riding upon an auto truck belonging to defendant. Plaintiff was then an employee of defendant and his duties were to assist in making delivery of furniture and other merchandise. A Mr. Leonhardt, now deceased, was the driver of the truck. Plaintiff and Leonhardt had left defendant's warehouse at about 8:45 on the morning in question to make deliveries in the vicinity of Garden Home, and, at about 10:45 in the forenoon, they were returning to the city with other deliveries to be made.

■ Taking plaintiff's testimony at par, as we must, in determining the propriety of the court's ruling upon defendant's motion for nonsuit, the record discloses that, at the time of the accident, plaintiff was sitting beside the driver looking at an order book to determine where the next delivery was to be made. The truck was being driven along the Garden Home road toward Portland at from fifteen to twenty miles per hour. The road was macadam, 16 feet wide, on a slightly descending grade. It was smooth, with no rocks, bumps or ruts. Within three or four feet of the westerly side of the road, there was a very steep bank extending down from the surface of the highway a distance of from twenty to twenty-five feet. Suddenly, the left front portion of the truck dropped down on the highway, the rim and tire of the left front wheel having come off. The truck then veered to the left across the highway and over the bank, and plaintiff received personal injuries.

Shortly after the accident, the head mechanic of respondent arrived from Portland, and, while looking

over the ground at the place of the accident, found a lug and a nut which afterwards he gave to plaintiff. Immediately after the accident, the smaller rim of the wheel was found at a point about twenty-five or thirty feet from the place where the truck went over the bank; and several other lugs and nuts were found at the place of the accident.

Plaintiff claims that the truck was defective and in an unsafe condition for use, and that defendant failed to exercise reasonable care in respect to furnishing a safe truck with which to carry on its work.

The record also discloses that defendant maintained a garage and repair shop where defendant repaired its trucks. In that department, there were two day mechanics and six night men.

■ The question involved is whether the doctrine of res ipsa loquitur may be involked in this case. We are not unmindful that many cases may be found holding that this maxim never applies in a master and servant case. On the other hand, there are many master and servant cases wherein it has been applied. 4 Labatt's Master & Servant, pp. 4864, et seq., section 1601 and cases there cited; 6 L. R. A. (N. S.) 337; 16 L. R. A. (N. S.) 214. The latter class of cases, in our opinion, is supported by the better reasoning. As stated by Mr. Labatt (ibid):

"No satisfactory reason is given why the maxim should not apply in such cases, although its application is somewhat restricted because of the subsidiary rules governing such relationship".

Among the many cases cited in note 10 of section 1601, Labatt on Master & Servant, supra, are six which we deem especially worthy of notice here.

One of these six is the case of *Folk v. Schaeffer,* 186 Pa. 263 (40 Atl. 401), wherein it was shown that the plaintiff was on an elevated platform, assisting fellow workmen in raising from the ground, 60 feet below, a hood, which was to be placed on the top of a smokestack. The block and tackle in use were fastened to the top of a piece of timber 14 feet long and 4 inches square, which stood on the platform, and was held in place by guy lines. One of the guy lines consisted of two pieces of rope tied together. The knot by which they were tied became undone or slipped, and the weight of the hood drew the timber against the stack, and the plaintiff, who was standing under the block and tackle, was struck, and thrown to the ground. The work preliminary to hoisting the hood was done under the supervision of one of the defendants, who gave directions as to the size of the timber to be selected from a pile in the yard, as to the ropes to be used for guys and who tied the knot which slipped and caused the accident. There was no direct proof of want of care in tying the knot.

The court there held that the conclusion that the knot was improperly tied was an inference from the fact that it became untied. The court then said:

"Ordinarily, an accident would not have happened as this did, if care had been exercised in tying the ropes. There was no difficulty in making them secure. Under the circumstances shown by the plaintiff, the burden was thrown on the defendants to show that due care had been used, and, in the absence of any explanation, the jury might infer want of care. The defendants were not bound satisfactorily to explain the cause of the accident, but they were bound to rebut the presumption of negligence arising from the attendant circumstances".

Another of the six cases mentioned is *Winkelmann & Brown Drug Co. v. Colladay,* 88 Md. 78 (40 Atl. 1078). There the evidence disclosed that the plaintiff was a young man 24 years of age, and had been employed by the defendant company about six years at its place of business, in Baltimore. At the time of the accident he had charge of the patent-medicine floor, which was on the second story of a five-story warehouse, where it was his duty to fill orders for medicines, and to send them down to the first floor by means of an elevator or dumb-waiter. This apparatus is described as a shaft running from the cellar to the fifth story of the warehouse, within which two boxes made of oak, each weighing about 40 pounds, are used as dumb-waiters, for hoisting to the upper floors, and lowering to the floors below, the goods that are needed from time to time to fill orders. There are speaking tubes between the first and other floors, except the second, and the employees on the first and second floors were compelled to use the shaft as a means of communication in giving orders from one floor to the other. "The plaintiff stated the way we got orders out from the second floor,—the only way we could communicate from the second floor to the others, we had to incline our head in the shaft of the dumb-waiter. The reason we had to do that was to get the sound. We could not hear what the orders were, because there was such a draught coming up there. We had no speaking tubes, and it was our place to do it". And, as to the accident, he stated that all he knew about it was that on the 24th of November, 1894, about a quarter after five, the bell was rung for an order. "I inclined my head on the side of the shaft to get the sound of what was said,— to find out what the order was—and just when I put

my head there the waiter fell from the fifth floor''. He further testified that this was the only and usual way to receive orders between the two floors, and it was the custom of the other employees to thus receive and give orders through this shaft. It further appears that the rope which supported the boxes of the dumb-waiter consisted of two hemp ropes, each three-quarters of an inch thick, and composed of three strands or twists, and that one of these strands had frayed out. The plaintiff also testified that he did not consider it dangerous to place his head on the side of the box, unless the waiter was in motion, and did not believe the waiter could fall of its own weight, when not in use; that it was unloaded and standing still on the fifth floor when the accident happened. Some of the witnesses testified that it was not necessary for the plaintiff to have inclined his head in the shaft to receive the orders from the first floor, and that he was advised of the condition of the rope prior to the injury, but this was denied by the plaintiff.

We quote the language of the court on this point:

"Now it is apparent that the material facts of the case are conflicting and this being so, the plaintiff had a right to have the whole case passed upon by the jury. It is well settled that unless there is some prominent and decisive act, in regard to the effect and character of which no room is left for ordinary minds to differ, Courts will not withdraw the case from the consideration of the jury. Central Ry. Co. v. Coleman, 80 Md. 337 [30 Atl. 918]. The prominent fact in this case is the falling of the dumb-waiter, while unloaded and at rest, from the fifth floor of the warehouse. There was no attempt to explain or refute the negligence imputed by the plaintiff's testimony, and in the absence of this explanation on the part of the company the law raises the presumption of negligence. The rope was not produced at the trial and the plaintiff testified that he

made an effort to see the rope after the accident but it could not be found—that it was in the possession of óne of the company's employees. In the recent case of Howser v. C. & P. R. R. Co., 80 Md. 146 [30 Atl. 906, 27 L. R. A. 154, 45 Am. St. Rep. 332], this Court said: 'Whilst the general rule undoubtedly is, that the burden of proof that the injury resulted from negligence on the part of the defendant is upon the plaintiff, yet in some cases the very nature of the action may of itself and through the presumption it carries supply the requisite proof.' "

Another of these cases is *Sullivan v. Rowe,* 194 Mass. 500 (80 N. E. 459). That action was for injuries received by plaintiff while in defendant's employ, shoring up a ditch some 18 feet in depth, by being struck on the head by a buffer iron which dropped from a Carson trench machine above the ditch. In this machine at the time and place of the accident six buckets were suspended from and ran along an iron rail on a girder supported by wooden legs about 15 feet in height. The buckets could be raised and lowered into the ditch by means of a tail rope, which ran through pulleys to the drum of the engine. In order to prevent the buckets from running along the rail beyond the desired point, a device known as a "buffer iron" is used. A buffer weighs about seven pounds, consists of two tongues of iron each about 21 inches long 3 inches wide and ¾-inch thick, and swings on a ⅜ or ½-inch pin or bolt driven through the girder, being so arranged that, when it is swung upwards on the pin by means of a rope, the buckets can pass along the rail, but when it is dropped the tongues prevent the buckets from passing, and hold the buckets stationery at the desired point. This pivot or bolt upon which the tongues of the buffer iron are sus-

pended extends beyond the girder on either side, and is kept in place by small two-pronged steel pins, called "split keys", or "cotter pins", which pass through holes on the pivot bolt or each sill of the girder.

The evidence was conflicting as to whether or not at the time of the accident there was a rope attached to the bolt on which the buffer iron was hung which would prevent it from falling in case the split keys came out, and the split key, the coming out of which released the buffer, permitting it to fall, was not produced at the trial; a witness testifying that it was so small that it could not be found in the bottom of the ditch after the accident.

The court said:

"In our opinion the falling of the buffer was under the circumstances in itself evidence of negligence".

Another case is *Texas & P. Coal Co. v. Daves,* 41 Tex. Civ. App. 289 (92 S. W. 275). There it was shown that one J. H. Daves was killed while being hoisted out of the coal mines of the defendant in Palo Pinto County, Texas, at which time he was in the employ of said defendant, and engaged, with others, in repairing defendant's shaft leading into and out of said mine; that the hoisting into and out of said shaft was done by means of a bucket to which was attached a wire rope or cable, which rope passed over a pulley or shive wheel at the top of the shaft, and thence to a cylinder or drum attached to an engine situated near the shaft; and that at the time in question, while Daves and others were being hoisted out of said shaft, the wire cable or rope, after circling the drum, or cylinder of the engine to the south end of said drum, climbed itself against the flange and ran off the end of said drum, causing the bucket to be precipitated back into

the shaft some 40 feet, Daves being thrown from the bucket and precipitated to the bottom of the shaft and killed; that the engine and drum to which the rope was attached was negligently so placed by the defendant, and had been, only a few days before the killing, so negligently moved and placed, that it was not in proper position and alignment with the pulley or shive wheel at the top of the shaft, thus causing the cable to climb the flange and run off.

The court said:

"We find that the evidence tended to prove negligence as alleged, and warranted the verdict, although the witnesses offered by the appellees to make out their case, being those in charge of and assisting in the work, all claimed to have adjusted and operated the machinery in a very careful manner".

*Fearington v. Blackwell Durham Tobacco Co.*, 141 N. C. 80 (53 S. E. 662), is a case wherein plaintiff and an employee of defendant, pursuant to the direction of defendant's superintendent, was riding up in a freight elevator, when the elevator unexpectedly dropped several inches thereby causing injury to the person of plaintiff. The court there held that, under the doctrine of res ipsa loquitur, there was evidence to be considered by the jury as to the negligent and defective condition of the elevator.

The last of the six cases mentioned is the case of *Dahlen v. New York Life Ins. Co.*, 109 Minn. 337 (123 N. W. 926), wherein the operator of an elevator was injured by its shooting up to the second floor, falling down to the ground floor, again jumping up to the second floor and finally falling four or five feet below the ground floor. From this case we quote as follows:

"The evidence shows that the defendant, by its engineer, had possession and control of the elevators

in the building, and that it was his duty to see that they were kept in repair and in good running order, and that the duty of the plaintiff was simply to operate his elevator. It follows that, if the accident did occur by reason of the elevator not working properly while the plaintiff was operating it, without any fault on his part, proof of such facts would be sufficient prima facie to establish the negligence of the defendant''.

■ The phrase, res ipsa loquitur, may be said to have a restricted and a general meaning. As applied to the facts in this case, it need not be given the restricted construction to the effect merely that the thing itself speaks. A nonsuit having been granted, only the evidence in behalf of plaintiff appears in the record. This evidence discloses that the defendant through its servants had the exclusive management and control of the vehicle which caused the injury; that plaintiff was without fault; that plaintiff's duties were such that the fellow servant rule does not apply; and that the accident occurred by reason of a defective part of the auto truck upon which plaintiff was riding.

We cannot agree with defendant's assertion that there was nothing defective about the truck. A defect implies a deficiency, a lack or want. Here it consisted of a lack of the proper adjustment and tightening of nuts and lugs, resulting in a loose rim. Aside from riding on it to make the deliveries, the only work about the truck which plaintiff was called upon to do was to fill the tank with gasoline. We think that the jury would have been justified in finding that the nuts holding the lugs which in turn kept the rim and the tire in place would not have fallen off if they had been properly tightened at defendant's shop.

A circumstance, having some significance, was the delivery by defendant's chief mechanic to plaintiff of the lug and nut which he found at the place of the accident. In the absence of any explanation, the jury certainly would have been justified in finding therefrom that, from a mechanic's viewpoint, these items were of evidentiary value in support of plaintiff's claim. In fact, to any one, they indicate that loosened nuts and lugs allowed the tire and rim to come off of the wheel.

Defendant cites *Finn v. Oregon W. P. & Ry. Co.*, 51 Or. 66 (93 P. 690). In that case, the plaintiff was injured when a chain broke which was being used by plaintiff to haul a log up to a donkey engine. No testimony was given as to the circumstances attendant upon the accident. It was not shown whether the defendant was negligent, or whether the chain broke because it was defective or not sufficient for the purpose intended; or because it was improperly used or put to unnecessary strain. In the case at bar, it is shown that the automobile was not improperly used or overloaded in any way, and plaintiff was not operating it.

In the case of *Duntley v. Inman,* 42 Or. 334 (70 P. 529, 59 L. R. A. 785), plaintiff's intestate had been employed by defendant running one of its planers. His duty was to start up the machine, run the lumber through it, see that it was kept in condition, and, if he found anything wrong with it, to report to the foreman. In the instant case, plaintiff did not operate the automobile, nor was it his duty to inspect it or keep it in condition.

■ *De Mars v. Heathman,* 132 Or. 609 (286 P. 144), is unlike the case at bar in that it involved an alleged grease spot on the stairway of a hotel and the testi-

mony failed to disclose how long such spot had been there. Here, the jury would have been justified in finding that the nuts upon the lugs holding the tire in place were loose when the auto truck was in the garage of defendant on the morning of the accident, because in the ordinary course such nuts and lugs do not fall off as a result of only two hours driving unless they were not properly tightened when such driving began. The law places upon the employer the duty of exercising ordinary care in keeping the implements and appliances used by his employees in reasonably safe condition.

*Phillipsen v. Hunt,* 129 Or. 242 (276 P. 255), is a case wherein the defendant did not have exclusive control over the injuring agency. Such is not the fact in the instant case.

The two federal cases, cited by counsel for defendant since the oral argument herein, belong to the class of cases wherein it is held that the doctrine res ipsa loquitur is inapplicable to cases between master and servant brought to recover damages for negligence.

We think that the motion for nonsuit should have been overruled.

For the reasons stated, the judgment of the circuit court is reversed and the cause remanded.

BEAN and ROSSMAN, JJ., concur.

RAND, C. J., concurs in the result.